*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TAVARIS JAVAHN WILLIAMS,

        Defendant-Appellant.

UNPUBLISHED
July 22, 2021

No. 350726
Saginaw Circuit Court
LC No. 18-045119-FC

Before: BORRELLO, P.J., and SERVITTO and STEPHENS, JJ.

PER CURIAM.

Defendant, Tavaris Javahn Williams, appeals as of right his convictions by a jury of first-degree felony-murder, MCL 750.316(1)(b), and first-degree child abuse, MCL 750.136b(2). The trial court, applying a second-offense habitual offender enhancement under MCL 769.10, sentenced defendant to concurrent sentences of life without parole for the felony-murder conviction and 356 months' to 60 years' imprisonment for the first-degree child abuse conviction. We affirm.

The convictions arose from the abuse and death of three-year-old JB. Defendant had been living with JB's mother, KL, and her five other young children. While KL was out shopping, JB suffered serious head injuries, was transported to a hospital, and died a few days later. Although JB's head injuries were fresh, he had many "old" injuries as well. Defendant admitted that he was sometimes too "rough" with JB but claimed that JB had simply fallen on the day in question. Medical witnesses testified that JB's head injuries could not have resulted from a fall.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL

-1-

Defendant contends that two of his trial attorneys, James Piazza and Kelly Ellsworth,[1] rendered ineffective assistance of counsel in several respects. He further contends that the trial court should have granted him a *Ginther*[2] hearing, and that a reversal or a remand for a *Ginther* hearing is necessary.

To obtain relief on the basis of ineffective assistance of counsel, a party "must show that counsel's performance fell short of [an] . . . objective standard of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the outcome of the . . . trial would have been different." *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015) (quotation marks, citation, and brackets omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citation omitted). A trial court's decision regarding whether to grant an evidentiary hearing is reviewed for an abuse of discretion. *People v Unger*, 278 Mich App 210, 216-217; 749 NW2d 272 (2008).

Defendant contends that trial counsel should have sought suppression of defendant's pretrial statements by way of a *Walker*[3] hearing. From the context of his briefing and his reference to *Miranda*,[4] defendant appears to be focusing, at least initially, on the custodial statement given at the police station. We note, however, that defendant does not identify what part of this statement he deems damaging to his case or identify in what way the statement was allegedly improperly elicited. As stated in *People v Bowling*, 299 Mich App 552, 559-560; 830 NW2d 800 (2013), an appellant may not leave it up to this Court to unravel his arguments for him—but this is exactly what defendant is doing.

In addition, a defendant has the burden of establishing the factual predicate for a claim of ineffective assistance of counsel. *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). As stated in *Hoag*:

> A convicted person who attacks the adequacy of the representation he received at his trial must prove his claim. To the extent his claim depends on facts not of record, it is incumbent on him to make a testimonial record at the trial court level in connection with a motion for a new trial which evidentially supports his claim and which excludes hypotheses consistent with the view that his trial lawyer represented him adequately. [*Id*. (quotation marks and citation omitted).]

---

[1] Defendant had three different attorneys in the lower court. He continually expressed dissatisfaction with his appointed attorneys and filed volumes of documents with the court detailing his grievances.

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[3] *People v Walker (On Rehearing)*, 374 Mich 331; 123 NW2d 87 (1965) (addressing the voluntariness of a defendant's confession).

[4] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

Defendant provides no affidavit or offer of proof on appeal in support of his suppression argument.[5] He contends that the trial court should have held a *Ginther* hearing on the issue, in order to elicit relevant evidence.[6] However, in *People v McMillan*, 213 Mich App 134, 141-142; 539 NW2d 553 (1995), this Court stated:

> Defendant further argues that he is entitled to a remand for an evidentiary hearing regarding his motion to suppress evidence. Defendant does not ask this Court to review the actual legal reasoning of the trial court, nor does he argue that it is clearly erroneous. Instead, defendant focuses on the trial court's failure to conduct an evidentiary hearing before its decision regarding the motion. *A remand is not necessary in this case, however, because there was no dispute of fact but only legal questions at issue before the trial court*. The only "fact" raised by defendant on appeal as being at issue is the fact that one police officer pointed out shoes to another police officer. However, defendant does not indicate how or why that fact would advance his position, nor does he point to any area in which further elucidation of the facts might advance his position. [Emphasis added.]

Defendant submitted nothing below in connection with his motion for a new trial or evidentiary hearing and is submitting nothing on appeal (in connection with his appellate briefs) to raise a proper factual dispute regarding what occurred regarding the elicitation of his statement at the police station.

Defendant asserts that he was subject to coercion when speaking to officers at KL's apartment, before departing for the police station after the incident involving JB. But this argument suffers from similar infirmities as those applicable to the arguments about the statement made at the police station. Defendant did not set forth any supportive documentation below and does not set forth anything on appeal to create a factual dispute regarding the propriety of the elicitation of the statements.

Both Piazza and Ellison decided, as a matter of trial strategy, to decline to seek a *Walker* hearing. See *People v Cooper*, 309 Mich App 74, 85; 867 NW2d 452 (2015) (explaining that "[d]efense trial counsel's decision not to object was trial strategy"). There is a presumption of sound trial strategy, *People v Daniel*, 207 Mich App 47, 58; 523 NW2d 830 (1994), and defendant

---

[5] MCR 7.211(C)(1)(a)(*ii*) states that if a remand for an evidentiary hearing is sought, the motion "under this subrule must be supported by affidavit or offer of proof regarding the facts to be established at a hearing."

[6] The trial court, in denying defendant's motion for a new trial or evidentiary hearing, stated that both Piazza and Ellsworth had decided not to seek a *Walker* hearing as a matter of strategy, that there was no evidence that any statement was improperly elicited, that the attorneys were entitled to refrain from raising futile motions, and that defendant had not shown that a further elucidation of facts at a hearing might advance his position.

has not overcome it. "This Court will not substitute its judgment for counsel's judgment as it relates to trial strategy." *Cooper*, 309 Mich App at 85.

Defendant next contends that trial counsel should have sought a defense expert to counter the prosecutor's medical witnesses or at least should have further investigated the possibility of obtaining such an expert. This argument, too, suffers from a dearth of factual support. Defendant provides no evidence or offer of proof that an investigation would have resulted in the uncovering of favorable defense witnesses regarding the medical facts. In fact, the evidence of record shows that Piazza spoke with an independent medical expert and concluded that calling a defense expert *would not benefit* defendant. Defendant has not shown that reversal or a remand is required in connection with his argument about an expert witness.[7] While defendant relies on *Ackley*, 497 Mich at 390, to support his argument, *Ackley* differs from this case because in that case a potentially favorable defense witness had been identified and ignored, *id*., and crucially, the defendant in that case provided affidavit support for his medical argument, *id*. at 387, 394.

Defendant also argues that trial counsel should have objected to certain testimony by Detective Scott Jackson of the Saginaw Township Police Department. He contends that the detective improperly testified that it was common for women, such as KL, who are in abusive relationships to minimize the abuse when speaking to the police. Defendant contends that only an expert witness could give this type of testimony. But defendant offers no authority in support of this argument. See *Bowling*, 299 Mich App at 559-560.

Detective Jackson was not qualified as an expert. Thus, the admissibility of his opinion testimony turned on whether "it [was] rationally based on the perception of the witness and helpful to a clear understanding of a fact in issue." *Daniel*, 207 Mich App at 57. Detective Jackson testified that he had conducted somewhere in the neighborhood of 20,000 interviews in the course of his career as a police officer. He had spent 14 years as an investigator. He stated that when interviewing KL, she sometimes minimized the actions of defendant, consistent with what he had seen in the past with other domestic-violence victims. Arguably, Detective Jackson's testimony met the test of *Daniel*. Alternatively, his extensive experience rendered him an expert. MRE 702. Either way, defendant has not met his burden of showing an error whose commission resulted in the reasonable probability of a different outcome. *Ackley*, 497 Mich at 389.

Defendant further contends that when Detective Jackson stated that he eliminated KL as a suspect in JB's death, this was based on hearsay and was therefore improper. Detective Jackson's testimony, however, does not indicate that this statement was based on hearsay. The premise of defendant's appellate argument is thus faulty. Moreover, video evidence was presented showing that KL was shopping during the time the fatal injuries occurred. Defendant has not shown a reasonable probability of a different outcome in connection with his argument because the detective had video evidence in support of his statement. *Id*.

---

[7] The trial court mentioned Piazza's investigation of this issue and noted that defendant had "provided no reason, no evidence, no offer of proof" in connection with his argument about the expert witness.

Defendant also argues that Detective Jackson provided hearsay testimony when he discussed interviews of the other children, but the detective specifically stated that he found nothing useful in the interviews regarding "the abuse that day of [JB]." Defendant also takes issue with the detective's mention of JB's medical records. While the detective referred vaguely to the medical records, those medical records were part of the evidence. As a result, defendant's purported hearsay arguments are without merit.

It is possible that defendant is making an inartful argument that Detective Jackson improperly opined on the ultimate issue by agreeing that defendant was "the sole remaining suspect." "A witness may not opine about the defendant's guilt or innocence in a criminal case." *People v Heft*, 299 Mich App 69, 81; 829 NW2d 266 (2012). However, police officers may "explain[] the steps of their investigations from their personal perceptions." *Id.* at 83. The detective spoke of defendant's status as a "suspect" and did not make a definitive statement of guilt. See *id.* No error is apparent under the circumstances.

Defendant's last argument concerning the purported ineffectiveness of counsel is that trial counsel erred by failing to discuss involuntary manslaughter during closing arguments. Notably, however, when the parties were discussing jury instructions, the prosecutor objected to the giving of an instruction on involuntary manslaughter, stating that it was not supported by a rational view of the evidence because defendant himself had claimed that JB had *fallen* on the day in question. Defense counsel stated:

> In response to that, Your Honor, it's very true that [defendant] does assert that he did nothing wrong in terms of handling the child. However, the prosecution is certainly asserting that there was some type of mishandling of the child, to put it lightly, which I believe would fall under the—the involuntary manslaughter jury instruction.

Counsel stated that an instruction on involuntary manslaughter involving an intent to injure should be given.

The jury was instructed on felony-murder, with an underlying felony of first-degree child abuse or attempted first-degree child abuse. The jurors were also instructed on the lesser charge of involuntary manslaughter. The court discussed the involuntary manslaughter charge four separate times during its instructions and it was included as an option on the verdict form.

Defendant contends that attorney Ellsworth erred during closing arguments by not explicitly asking the jury to consider involuntary manslaughter. But counsel had to tread a fine line of either arguing for a complete acquittal or a compromise, and he also had to contend with defendant's statement about JB's having incurred his head injuries in a fall. It appears that Ellsworth chose to focus largely on a complete acquittal in closing arguments, while still allowing the jury to consider manslaughter by way of the jury instructions. Defendant has not overcome the presumption that this was sound trial strategy. *Daniel*, 207 Mich App at 58. In addition, given the trial court's repeated mention of the option of involuntary manslaughter and the wording of the verdict form, defendant has not met his burden of showing an error whose commission resulted in the reasonable probability of a different outcome. *Ackley*, 497 Mich at 389. In sum, defendant has established no entitlement to a reversal or remand in connection with his ineffective-assistance

arguments and has demonstrated no error by the trial court in its resolution of defendant's ineffective-assistance arguments that were made below.

## II. SUFFICIENCY OF THE EVIDENCE[8]

Defendant contends that the prosecutor presented insufficient evidence to sustain his convictions. We disagree.

"This Court reviews de novo a defendant's challenge to the sufficiency of the evidence supporting his or her conviction." *People v Lane*, 308 Mich App 38, 57; 862 NW2d 446 (2014). In reviewing a sufficiency argument, this Court "review[s] the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could find that the prosecution had proved the crime's elements beyond a reasonable doubt." *Id.*

MCL 750.316(1)(b) states that "[m]urder committed in the perpetration of, or attempt to perpetrate . . . child abuse in the first degree" is "first degree murder and shall be punished by imprisonment for life without eligibility for parole[.]" At the time of the present offense, MCL 750.136b(2) stated: "A person is guilty of child abuse in the first degree if the person knowingly or intentionally causes serious physical or serious mental harm to a child. Child abuse in the first degree is a felony punishable by imprisonment for life or any term of years."[9] In addition, "[t]o prove murder, the people must demonstrate that the defendant acted with malice in causing the death of another. Malice is defined as (1) the intent to kill, (2) the intent to do great bodily harm, or (3) a wanton and wilful disregard of the likelihood that the natural tendency of the defendant's act is to cause death or great bodily harm, i.e., depraved-heart murder." *People v Dumas*, 454 Mich 390, 396-397; 563 NW2d 31 (1997) (citation omitted); see also *People v Reichard*, 505 Mich 81, 87; 949 NW2d 64 (2020).

The testimony and exhibits presented at trial were more than sufficient to support defendant's convictions. Officer Adam Deal with the Saginaw Township Police Department testified that when he responded to the scene on the day of the incident, he noted that there were several children in the apartment but no other adults aside from defendant and the emergency responders. According to Officer Deal, defendant seemed upset and distracted; he threw a cellular telephone onto the ground with enough force "that the back of the cell phone broke off." Defendant told Officer Deal that JB had slipped and fallen inside the home.

A paramedic who responded to the scene testified: "We had evidence suggesting that there was traumatic brain injury. [JB] had a distorted pupil." The paramedic said that the eye injury seemed fresh but that JB had other, older wounds as well. Consistent with the testimony,

---

[8] We note that the remainder of defendant's appellate arguments are raised in a brief filed by defendant pursuant to Michigan Supreme Court Administrative Order No. 2004-6, Standard 4.

[9] This statute has been minimally modified and now states: "A person is guilty of child abuse in the first degree if the person knowingly or intentionally causes serious physical harm or serious mental harm to a child. Child abuse in the first degree is a felony punishable by imprisonment for life or any term of years."

photographs depicted various injuries on JB. For example, a couple of the photographs showed fluid coming out of JB's left ear and another showed bruising on JB's lower hip. Another showed redness and discoloration in the area of JB's stomach, and others showed "darker" bruising on his "backside" and buttocks.

Defendant claimed to have heard JB slip and fall in the bathroom. He told Detective Sergeant Chad Brooks with the Saginaw Township Police Department that KL was not home at this time and had been gone for approximately two hours before the incident. Defendant denied to Detective Sergeant Brooks that the children had been fighting among themselves. Detective Sergeant Brooks examined JB's younger sibling, BB, and found that he had, on his arm, a sizable "imprint" of an object consistent with a belt. Defendant admitted, in general, to having "whupped or spanked" JB.

KL testified that defendant was abusive toward JB and BB. She testified that defendant became the disciplinarian for the children and would make them "stand in the corner" or would spank them. He "would leave marks on them" from his hand and in the past, he had used a belt. KL stated that she told defendant that it was wrong to leave marks on them. She said that she told a neighbor about defendant's excessive physical discipline but was scared to tell the police because defendant was abusive toward her. KL denied that she had ever physically disciplined the children aside from a "swat on the butt" with "no force," without leaving any marks.

KL stated that on the day in question, she woke up midmorning, got the children breakfast, and was planning to go out for a money order and to buy groceries. JB was not at breakfast because defendant did not want him to come out of the bedroom, due to a bathroom accident the prior day. He then had a peeing accident in the bedroom, before KL left for her errands. She cleaned him up and he went back to the bedroom. She observed bruising on him while cleaning him up. KL said that she heard defendant spanking JB before she left for the errands. When she left, only defendant and the six children were in the apartment. When she returned, she saw the police cars and police officers.[10] When she entered the building, defendant told her that JB had fallen and hit his head.

The treating physician testified that JB was "totally unresponsive" and had "multiple bruises over his abdomen, over his buttocks, over his back." JB had a "subdural hematoma involving the left parietal area of the brain." The doctor said that the injuries were not consistent with a fall. The doctor testified, "So the force of impact by just running hundred percent [sic] cannot explain the degree of injury." He said that the history provided "did not make sense."

The pathologist testified that JB had "slightly healing bruises" on his face, chin, abdomen, and back. The "fresh" injuries were in JB's head and were very recent. When the pathologist peeled back the skin on JB's skull, he found that there were nine areas of contusion in the skin around the frontal area of the brain. He said that if a child dies as a result of a fall, usually he

---

[10] Detective Jackson verified, by way of surveillance-camera footage, that KL had been grocery shopping at the time of JB's fatal injuries, with timestamps occurring for her entry into the store at 1:09 p.m. and exiting the store at 2:27 p.m. He testified that he eliminated KL as a suspect regarding JB's death.

would see "one impact," instead of the multiple areas of impact that were apparent in the present case. He also stated that a child of JB's size would not generate enough force from falling to cause as much injury as JB had sustained, unless the child had fallen from a height. The pathologist classified JB's death as a homicide, with the cause of death being "blunt force head trauma with complications because the brain got swollen," leading to pneumonia.

Defendant testified that he "took on a parental role" for the children and "did discipline them." Defendant said that, on the day of the incident, he let the children run "[u]p until the accident." Defense counsel asked what this "accident" was, and defendant replied:

> I didn't—like I said, everybody, I don't know exactly what happened.
>
> But I know what happened prior to the injury of him, or whatever. And I did say I put the marks on him, but I didn't do it purposely. It was—it was a total accident, you know. I didn't—I didn't try to do it at all, so. And [KL] did come to me about it, and I told her I would stop discipline [sic], and she took over from there, so.

He said, "I guess I was a little bit too rough."

The above was sufficient to show that defendant abused and killed JB with the requisite intent. He denied that the children had been fighting among themselves, and he was the only adult in the home at the time of the head injuries. He admitted being rough with JB. He provided an implausible explanation for JB's injuries. "Circumstantial evidence and reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of the crime." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). "[B]ecause it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *Id*. at 622. JB was a defenseless, three-year child who had nine separate head injuries. As such, an inference can be made that defendant acted with "a wanton and wilful disregard of the likelihood that the natural tendency of the defendant's act is to cause death or great bodily harm[.]" *Dumas*, 454 Mich at 396-397; *Reichard*, 505 Mich at 87, and that he knowingly inflicted harm, MCL 750.136b(2).

## III. COMPOSITION OF JURY

Defendant contends that there was purposeful discrimination at jury selection in violation of *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986), and that the jury venire did not contain sufficient African-American people so as to be representative of Saginaw County as a whole. We review these unpreserved issues for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

The Michigan Supreme Court in *People v Bell*, 473 Mich 275, 282-283; 702 NW2d 128 (2005) (opinion of CORRIGAN, J.),[11] amended 474 Mich 1201 (2005), stated:

> In *Batson*, the United States Supreme Court made it clear that a peremptory challenge to strike a juror may not be exercised on the basis of race. The prosecution in *Batson* attempted to exclude African-American jurors solely on the basis of their race. The Court determined that the prosecution's actions violated the Equal Protection Clause. It set forth a three-step process for determining an improper exercise of peremptory challenges. First, there must be a prima facie showing of discrimination based on race. To establish a prima facie case of discrimination based on race, the opponent of the challenge must show that: (1) the defendant is a member of a cognizable racial group; (2) peremptory challenges are being exercised to exclude members of a certain racial group from the jury pool; and (3) the circumstances raise an inference that the exclusion was based on race. The *Batson* Court directed trial courts to consider all relevant circumstances in deciding whether a prima facie showing has been made. [Citations omitted.]

In *People v Bryant*, 491 Mich 575, 597; 822 NW2d 124 (2012), the Court stated that "to make a prima facie case of a violation of the Sixth Amendment's fair-cross-section requirement," a defendant is required to show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. [Quotation marks and citation omitted.]

It is not disputed that defendant is African-American. He alleged at sentencing that the jurors had all been white. The problem, however, is that defendant has submitted no evidence that the prosecutor was exercising peremptory challenges to exclude members of a certain racial group from the jury pool. *Bell*, 473 Mich at 283. Nor has he supported his assertion that the jury venire did not contain a sufficient number of African-American people to be representative of Saginaw County as a whole. *Bryant*, 491 Mich at 597.

An appellant bears "the burden of furnishing the reviewing court with a record to verify the factual basis of any argument upon which reversal [is] predicated." *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000). Defendant has not done so and for this reason reversal is not warranted.

## IV. *BRADY*[12] VIOLATIONS

Defendant contends that the prosecutor committed *Brady* violations by failing to turn over evidence favorable to the defense. We review this unpreserved issue for plain error affecting

---

[11] Four justices concurred in the cited portion of the opinion.

[12] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

substantial rights. *Carines*, 460 Mich at 763. Under the plain-error doctrine, reversal is warranted if a "clear or obvious" error occurred that "affected the outcome of the lower court proceedings." *Id*. And even if this standard is satisfied,

> an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. [*Id*. at 763-764 (citation, quotation marks, and brackets omitted).]

A *Brady* violation occurs when "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) [that,] viewed in its totality, is material." *People v Chenault*, 495 Mich 142, 155; 845 NW2d 731 (2014). "Evidence is favorable to the defense when it is either exculpatory or impeaching," and whether the prosecutor acted in good faith is irrelevant. *Id*. at 150. "To establish materiality, a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citation omitted). The question of materiality involves ascertaining whether "the defendant received a trial that resulted in a verdict worthy of confidence." *Id*. at 157-159. A prosecutor has a duty to learn of information known to others acting on behalf of the government, including the police. *People v Dimambro*, 318 Mich App 204, 213; 897 NW2d 233 (2016).

Defendant contends that the prosecutor withheld information that one of the other children, during an interview, stated that JB ran into a bathroom and she " 'saw it.' " There are two problems with this contention. First, defendant contends that the statement is in a police report, and there is no indication that the defense did not have access to the police reports. In fact, defendant claimed at trial that he had knowledge of what the other children had said, thus belying any claim of a *Brady* violation. Second, the contention recited by defendant is ambiguous, whereas Detective Jackson stated at trial that he found nothing useful in the children's interviews regarding "the abuse that day of [JB]." Defendant has established no clear or obvious error with regard to the children's statements. *Carines*, 460 Mich at 763.

Defendant also takes issue with evidence regarding KL's child-protective services (CPS) history and alleged evidence that children had been injured in her care in the past. But KL admitted at trial that she had been investigated in the past by CPS, once for failing to provide "well checks" for the children and once for having left them without supervision. Defendant complains that some of KL's children had injuries before defendant ever become involved with the family, but he does not furnish this Court with the factual basis for this allegation. *Elston*, 462 Mich at 762. Also, for one of these alleged injuries, he admits to the jury's having seen a photograph of it, thus belying any *Brady* violation. Defendant mentions his alleged stellar reputation regarding childcare, but this was elicited at trial during his testimony. Defendant also complains about KL's contacting him at the jail, but seeing as this contact was *with him*, there clearly was no withholding of information by the prosecutor. He contended below that the prosecutor had "suppressed" evidence of a letter written to him by KL, but the prosecutor turned over this letter.

Defendant makes a similarly misguided argument about Officer Leon Wilson with the Saginaw Township Police Department. He contends that Officer Wilson improperly rendered aid to JB and may have caused JB's injuries by treating JB roughly. It was defendant himself, however, who allegedly observed this rough treatment; as such, there was no withholding of exculpatory information by the prosecutor.

Defendant also contends that the prosecutor withheld information regarding the state of JB's ribs. But this information was explored at trial. After testimony was presented by the treating doctor that JB did have broken ribs, the examining pathologist stated that JB did *not* have any broken bones, but he added that he did not conduct any x-rays or computerized-tomography (CT) scans. The prosecutor implied that there may have been fractures visible on a CT scan viewed by the treating doctor that were not visible upon manual examination by the pathologist. The pathologist said, "Some people argue that way," but seemed to opine that in the present case, the CT scan conducted while JB was still alive had been misinterpreted as showing broken ribs. In large part, the information defendant claims should have been presented—i.e., that JB did not have broken ribs—was, in fact, presented to the jury. Also, there is no indication that the defense was not provided the pathology findings. Defendant has established no clear or obvious error in connection with the "broken ribs" issue. *Carines*, 460 Mich at 763.

## V. SPEEDY TRIAL

Defendant next asserts that his right to a speedy trial was violated. An appellate court reviews factual findings in connection with a speedy-trial issue for clear error. See *People v Williams*, 475 Mich 245, 260; 716 NW2d 208 (2006). We note, however, that this Court has stated that a speedy-trial decision is reviewed de novo as a constitutional matter. *People v Cain*, 238 Mich App 95, 111; 605 NW2d 28 (1999).

MCL 768.1 states:

> The people of this state and persons charged with crime are entitled to and shall have a speedy trial and determination of all prosecutions and it is hereby made the duty of all public officers having duties to perform in any criminal case, to bring such case to a final determination without delay except as may be necessary to secure to the accused a fair and impartial trial.

See also US Const, Am VI, and Const 1963, art 1, § 20.

"The time for judging whether the right to a speedy trial has been violated runs from the date of the defendant's arrest." *Williams*, 475 Mich at 261. " . . . a defendant's right to a speedy trial is not violated after a fixed number of days." *Id*. The Michigan Supreme Court stated in *Williams*:

> In determining whether a defendant has been denied the right to a speedy trial, we balance the following four factors: (1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant. Following a delay of eighteen months or more, prejudice is presumed, and the burden shifts to the prosecution to show that there was no injury. Under

the *Barker*[13] test, a presumptively prejudicial delay triggers an inquiry into the other factors to be considered in the balancing of the competing interests to determine whether a defendant has been deprived of the right to a speedy trial. [*Id.* at 261-262 (quotation marks and citations omitted).]

It is not in dispute that defendant was arrested on January 1, 2018, and that trial began on July 17, 2019. Accordingly, the 18-month period stated in *Williams* was exceeded by 17 days.

Regarding factor (1), as mentioned in *Cain*, 238 Mich App at 112, the delay here did not "approach the outer limits of other delays [this Court has] addressed," such as delays of over 30 months. Regarding factor (2), it is apparent that the delays were, in large part, caused by or agreed to by the defense. For example, at a hearing on August 20, 2018, dealing with defense motions for a *Walker* hearing and for a competency examination, attorney Piazza noted that trial was scheduled for September 18, adding, "that's unrealistic, so I ask that be adjourned." The court said, "Well, I think you're correct, Mr. Piazza. There's no way we'll get the report back by that trial day." Defendant agreed on the record to this adjournment. After a stipulation regarding competency on October 1, 2018, trial was set for December 4. On November 19, 2018, Piazza sought the court's advice about whether to continue representing defendant, because defendant was accusing him of various misdeeds such as "working for the prosecution." The court stated that Piazza had done nothing wrong, stated that defendant was already "on [his] second attorney," and stated that he was not going to allow Piazza to withdraw. Piazza stated that another trial adjournment was needed because of the recent receipt of preliminary-examination transcripts and motions he needed to file. Defendant agreed to a trial date in 2019.

On January 8, 2019, Piazza noted that trial had been scheduled for January 23 but that an adjournment was needed, partly because he was still "discussing the matters with possible forensic pathology experts." Piazza also noted that the *Walker* hearing was set for the following week. The court agreed to allow the adjournment. On January 15, 2019, the court stated that this was the date set for the *Walker* hearing but that the defense was withdrawing the motion for such a hearing. Piazza agreed, stating that he had had "numerous discussions with" defendant and that the defense was withdrawing the request for a *Walker* hearing. Defendant said that he had confidence in his lawyer, but stated, "being locked up, it ain't so easy." He said, "And I been, like, the speedy-trial thing, I don't know—" The court explained that Piazza was a very experienced attorney and would explain certain things to defendant. The court noted that trial was currently set for April 2, 2019, on the basis of the earlier defense request for an adjournment, and stated that if that date was not going to work, Piazza could discuss the issue at a pretrial conference in February. Piazza said, "Okay. That would be fine."

At a hearing on February 11, 2019, Piazza explained that defendant was again accusing him of favoring the prosecution and was wanting a hearing regarding Piazza's performance. Defendant said that Piazza "didn't investigate" and "withdr[e]w" the request for a *Walker* hearing. Defendant said he wanted the *Walker* hearing. The court asked defendant if he wanted a new attorney, and defendant said that he wanted Piazza to do more for him. Piazza explained that defendant was wanting him to file frivolous motions, that defendant had asked twice for Piazza to

---

[13] *Barker v Wingo*, 407 US 514; 92 S Ct 2182; 33 L Ed 2d 101 (1972).

withdraw, and that he was asking to be taken off the case. Defendant claimed that he did not need Piazza to withdraw but that he needed Piazza to find more witnesses and do other things. The court explained that Piazza was a very experienced and effective attorney. Piazza reiterated that he was not able to work effectively with defendant, and the court granted the request to withdraw and referred defendant for a new attorney.

On March 13, 2019, by which time Ellsworth had been appointed as defendant's attorney, the court noted that defendant had filed a motion to represent himself. But defendant stated on the record that he had changed his mind and was now "see[ing] eye-to-eye" with Ellsworth. Ellsworth explained that he had been appointed on February 13, 2019, and that he needed time to review the voluminous discovery materials in the case. He asked for an adjournment of the April 2 trial date, and defendant agreed. From this history, it is apparent that most of the delay was caused by needs of the defense or by defendant's continual problems in getting along with his counsel.

With respect to factor (3), defendant did assert his right to a speedy trial. As for factor (4), the delay largely inured to the benefit of the defense because it allowed defendant's counsel to better prepare and allowed defendant, after his expression of dissatisfaction with Piazza, to get a newly prepared attorney. While prejudice can be to a defendant's person—for example, by causing anxiety in jail—the Supreme Court "has held that the prejudice prong of the *Barker* test may properly weigh against a defendant incarcerated" even for 19 months, "if his defense is not prejudiced by the delay." *Id*. at 264.[14] In sum, while factor (3) weighs in defendant's favor, considering all the factors, the court did not err by finding that no speedy-trial violation occurred.

Affirmed.

/s/ Stephen L. Borrello
/s/ Deborah A. Servitto
/s/ Cynthia Diane Stephens

---

[14] It is worth noting, too, that the trial court was patient with defendant throughout the proceedings and, during trial, even got the jail nurse in to check on defendant's concerns about anxiety and insomnia.

-13-